Good morning. May it please the Court, Gia Kim appearing on behalf of Appellant Joseph Spadafore. I'd like to reserve four minutes of my time for rebuttal. All right, Counsel. Please be reminded that the time shown is your total time remaining. Thank you. All right. Mr. Spadafore raised both suppression and sufficiency challenges to his conviction, and I plan to address those issues in that order, unless the Court is otherwise inclined. First, as to suppression, Mr. Spadafore had standing to challenge the warrantless search of the Grand Avenue property. And by standing, of course, I mean that he had a subjective expectation of privacy in that home, and that expectation was one that society is prepared to recognize as reasonable. Starting simply with the declarations of Mr. Spadafore, that's at ER 205, and his girlfriend, Christy Garrett, that's at ER 66 and 67, those declarations established that he was an overnight guest, at a minimum, an overnight guest. And under the Minnesota v. Olson, which is a case the District Court notably did not mention in its standing ruling, overnight guest status is, quote, alone enough to confer standing for Fourth Amendment purposes. Counsel, assuming we agree with you, and I'm just speaking for myself, but assuming that we agree with you that there is standing, why wasn't there sufficient evidence for a probable cause for the search, or exigent circumstances, I should say? I will turn to the merits, Your Honor. Okay. So, I think at the outset, well, there are two possible exigencies that the government and the District Court relied on here, and one I would refer to as your classic fire exigency established by Michigan v. Tyler, which itself has two parts, the first being that the firefighter, you know, a burning building presents a classic exigency, so the that's not an issue here, because at ER 161, the Captain Valdivia, the hazmat officer, said the fire was, quote, extinguished by the time he got there. The second part of the Tyler... But does that mean the exigency has dissipated simply because the fire is out? Well, there is, not necessarily, Your Honor, there is a second part to Tyler, which says that fire officials may remain on the scene for a reasonable amount of time to investigate its cause. Only fire officials? It's... I guess there are cases saying fire officials and police are not differentiated for purposes of the Fourth Amendment here, so there may be, we would grant cause for anyone to come and investigate the cause of the fire. But again, at ER 164, that's not what Captain Valdivia says he's doing. He says he was there to review... He was asked by others to review the site for potential hazardous materials. You know, this... Isn't that part and parcel, though, of the fire investigation? I would argue not under the facts of this case. That Tyler sort of Clifford exigency arose most often in cases where there was some suspicion of arson, and it was very clear that they were standing there, staying on the premises to figure out what the cause was. Here, by contrast... Could they stay on the premises to ascertain whether there was further danger of combustion? I would argue that that constitutes a separate exigency for which there must be an independent showing of exigency or emergency. Okay, so you're relying upon to support the argument that there has to be a separate exigency in those circumstances. I think as the fire exigency is set forth in Tyler itself, and it's reaffirmed in cases like Missouri v. McNeely, it's mentioned, the fire exigency is limited to putting out the fire or investigating its cause. Now, there may be a separate emergency which has to rise to the level of preventing a threat to human life or serious, at least serious bodily injury. And I think the cases the government relies on, there are explosions, there are reports of people with amputated fingers, there are reports of bleeding people who haven't been recorded. And here, there's no indicia of exigency as to this fire captain's arrival. I appreciate the argument. It's a little difficult, though, to start parsing these events in that way when they happened in the middle of the night and when you're dealing with first a fire that was toxic chemicals within the house that presented a serious risk of danger to the rest of the house and possibly to other people. And so I find it difficult to kind of be splicing up the events of what really was a continuous episode involving a fairly dangerous situation. I think that this is based on the fire department's own log. There's that dispatch log at ER 177 of events. You know, the fire chief, who you saw in the video, he said by a certain point, 2-14, quote, the incident's terminated on the fire side. They're going to, you know, hand it over and take off. It is not until after that that Captain Valdivia is being dispatched. He was handing it off to another section of the fire department, though, correct? I think he was handing off to Riverside Sheriff's Department at that point. But didn't other firefighters remain on the scene and continue to perform safety activities? That was all completed by 2-14. The arrival of Captain Valdivia was requested, I believe, by Riverside Sheriff's Department. Is it your recollection of the record that when the police were going through the house, there were no firefighters there? Is that your recollection of the record? The warrant is based upon the entry of Captain Valdivia, who is a fire official. But I'm asking you in the entire record. Is it your recollection of the record that when the police went through the house, there were no firefighters on site? No, Your Honor. I believe that the first – it's not clear if the officer went with Captain Valdivia the first time or maybe a second separate time, but I believe that there were fire personnel on the site. So is it correct to say that the event had been handed off to the police if there were still firefighters on site? I don't think that's necessarily the test for an exigency. Well, that's the point you made. Well, I think it's one factor if there is indeed a fire-related exigency, we should defer to the conclusion of the fire chief that that fire exigency has abated. And if there is indeed an exigency related to chemicals, which I would argue that Captain Valdivia did not know at ER 161. He knew about glassware and tubing and the like. This much more elaborate picture that the government paints in its brief came from the trial testimony, not from the suppression. But that if HazMat has an emergency response, there are indications of that response. First, I would say haste. They don't wait three hours to show up at the scene. They were a consultant early on and were not asked to come. Second, in these other cases from this circuit and out of circuit, there's usually an evacuation, if not of neighbors, but also of the personnel itself. You know, the people in those cases see something that looks like a bomb and everyone, even the first responders, evacuate. So I think those are sort of the indications of exigency that we're looking for. Suppose, since you mentioned the bomb, suppose there was a bomb in the garage  but they don't know if there are other bombs elsewhere in the house. Would it be exigent circumstances for the fire department to go through other parts of the house to make sure there aren't other bombs there? I think it depends on the circumstances. If they took, I think the indications of exigency are objective. So if they called the bomb squad, everyone else evacuated, the bomb squad came, the robot came, you know, that was all done quickly. The neighbors were told to evacuate. That could well be an exigency. But I think you have to look at what objectively happened. And here, you see on the video, you see from the declaration of the girlfriend that everyone's proceeding about their business. Certainly they're putting out a fire. That fire, that only took about 15 minutes. But after that, there's no sense of this is a situation that is imminently threatening to human life or security. If there are no further questions on that, I would turn quickly to the sufficiency argument as to 21 U.S.C. 856 that there are two parts to that statute, but what Mr. Spadafore was charged with was using or maintaining a place for the purpose of manufacturing a controlled substance. The government, since they did not really focus on using a trial, I will turn to the maintaining portion of that. And maintaining, as that very word connotes, involves a sense of control over time. And the jury instruction reflects this by saying there's some direction of the activities and the people in that place over time. This district court asked at one point, ER 286 to 87, who are the people he's directing here? I would add there is insufficient evidence of the activities he's directing there over a period of time and that the single sign that the government's relying on about the dogs coming into this room doesn't meet that standard. Also, we've argued that they didn't sufficiently show his intent to manufacture there. Certainly, a reasonable jury could infer that he was living in the midst of this lab. And I don't think that was really contested at trial, but as to his intent, there isn't any evidence going to that specifically. And if there are no further questions, I would reserve the remainder of my time. All right, thank you, counsel. We'll hear from the government. May it please the court, Jeanne Pernas on behalf of the United States. I would like to begin with Captain Valdivia's warrantless entry into the Grand Home. This court should affirm the district court's ruling that Captain Valdivia's entry into the Grand Home was permissible under the exigency exception to the Fourth Amendment in light of the explosions that rocked the Grand Home, the fire that engulfed the garage and threatened the rest of the home, and the sprawling drug laboratory that was found in three rooms of the Grand Home. The photos that were attached to the government's opposition to the motion to suppress at ER 184 to 186 amply demonstrate that this was not a small fire. Captain Valdivia's declaration indicates how dangerous drug laboratories, particularly butane honey oil laboratories, are. He outlined that the use of dangerous gases such as propane and butane in these type of laboratories, soaking the butane honey oil product in flammable solvents, and the use of an extraction process that involves heat and pressurized vessels all contribute to risk of explosion and fire. Counsel, I don't think opposing counsel takes issue with the fact that the firefighters' warrantless entry was justified. She takes issue with the fact that the police officers did the search thereafter. Her contention is that the fire was suppressed. What's your response to her challenge to the entry of the police officers? Captain Valdivia was there legitimately in order to determine whether there were any potential hazards at the Grand Home, whether the home was safe, and whether it posed a hazardous environment. There is nothing in the record that speaks to the two RSO officers' intent in accompanying him into the Grand Home. I would submit that the only reason they, Captain Valdivia, was called to the scene was in order to determine that there were no other dangers that the Grand Home posed, particularly in light of the fact that there were multiple explosions reported at the property. The fire was significant, and there was an active drug laboratory in the Grand Home with dangerous chemicals involved and dangerous gases, and Captain Valdivia, as CAL FIRE's hazmat expert, knew exactly how dangerous this was. What was the function of the police officials there? I believe from the CAL FIRE log, Your Honor, the police officials served multiple functions. They were there for on-site traffic control. They were also there to assist the firefighters as needed. I believe they were there as well to investigate the cause of the fire, to potentially see if there was a criminal investigation involved, which was for purposes of the criminal investigation, and I believe that was why Investigator Plumier was there, as was Investigator G.M. Powley. So they served multiple functions. The search warrant was based on Valdivia's observations as provided to the officer who submitted the warrant? Yes, Your Honor. And what time was the warrant submitted to the court? I do not... I can find that... Sometime in the early morning? I believe it was sometime in the early morning. I want to say 8 a.m., but I'm not exactly sure. So it says that Captain Valdivia subsequently accompanied law enforcement officers while wearing air monitoring devices in order to check the air quality and confirm the nature of the lab inside the home, particularly whether it involved hazardous materials that could pose a danger to life, property, or the environment. Is it your position that this is still part of the exigent circumstances? Yes, Your Honor, absolutely. Why? The fact that there was an active drug laboratory in the home, the fact that this drug laboratory involved the use of dangerous chemicals and dangerous gases, and that there was an explosion that decimated the garage and threatened the rest of the home means that the chemicals present at the home still posed a danger to anybody going in. Why would law enforcement officers need to be present for that portion of Captain Valdivia's survey? It's unclear why law enforcement was present with Captain Valdivia, Your Honor. I would submit that that doesn't vitiate the fact that Captain Valdivia was there for a legitimate reason. There is no evidence in the record that speaks specifically to the two RSO officers' intent when they accompanied Captain Valdivia. I would argue that based on the dangerous lab that was discovered, it was absolutely exigent for Captain Valdivia to enter the home and confirm that it was safe. And in fact, 24 hours after the fire had already been put out, the home still posed a danger to people going in, as the trial transcript showed, with Mr. Dabena, who had his hazmat suit blown off and his face mask destroyed, and when a metal canister exploded. Is there a time limit for exigent circumstances? Mr. Spadafore's counsel suggests that there wasn't exigent circumstances because there was a time gap of, I don't know what it was, two hours or so before the hazmat team went in. I would argue that it depends on the circumstances, Your Honor. At some point, it doesn't become reasonable for law enforcement to enter a property without a warrant, as I think the Supreme Court held in Clifford. But in this case, it was absolutely, eminently reasonable for the hazmat team to enter three hours, only three hours after the fire had been put out. Captain Valdivia's declaration and the district court found that when Captain Valdivia arrived, CAL FIRE personnel were still working on the scene. There were no active flames, but the absence of an active fire does not mean that exigency has abated. It does not mean that the firefighting function has terminated. That would be a narrow view of the firefighting function in this situation. So, counsel, do you take issue with opposing counsel's representation that Captain Valdivia made a notation that the fire was out and the investigation was turned over to law enforcement? Do you take issue with that representation, that he made that note in his log? I take issue with representation that there were no... And I wasn't entirely clear, but I take issue with representation that there were no CAL FIRE personnel at the scene. But her point was that it had changed from a fire investigation to a criminal investigation when it was turned over, when Captain Valdivia noted that it was turned over to law enforcement. What's your response to that position? I absolutely do take issue with the fact that... with the implication that this was changed from a fire investigation into a criminal investigation. The fire team clearly, and I believe the district court noted this, there are two functions. Chief Davis was responsible for the actual active fire. Captain Valdivia was the hazmat expert for CAL FIRE, and he was responsible for assessing the scene for hazardous materials. They served different functions. They had different levels of expertise. To say that law enforcement waited for Captain Valdivia to come in order to commence their criminal investigation, frankly, doesn't make sense with this... in light of the facts in the record, because Captain Valdivia wasn't necessary at all for the criminal investigation. If the law... if law enforcement needed a warrant to get into the grand home, they could have easily relied on the fact that explosions had destroyed the garage. There was a fire in the house. In plain view in the garage were multiple five-gallon propane canisters, and the first responders who had entered the home and seen the drug lab inside the home reported that there was an active drug laboratory in three rooms of the grand home. That would have been more than sufficient to get the warrant. Captain Valdivia was there solely to assess the scene to see if it posed any immediate dangers to people going in and see if the hazardous... if there was a hazardous environment inside the grand home. Could you briefly address the maintaining portion of the merits of the case? Absolutely, Your Honor. So the position of the government... the government presented evidence on four pieces... the government presented evidence on four points to demonstrate that the defendant intentionally used or maintained the grand home for the purposes of manufacturing drugs. The defendant was a sole resident and caretaker of the grand home. He admitted this in a survey that he sent. He had bills posted on the wall of the master bedroom that ranged from April to October 2017. The defendant opened utilities in his name at the grand home on October 2016, almost a full year before the home exploded, on November 3, 2017. The utility payments were not insignificant. In July... I believe in July, September, and October... or no, in July, August, and September, the defendant paid close to $600 in utility payments for the grand home. All of this shows that he was maintaining the grand home for the purposes of manufacturing drugs. His possessions, in addition, were not discreetly contained in one location. They were scattered throughout the home, and they were intermingled with drug equipment. In the master bedroom bathroom, he had four jars of honey oil underneath the kitchen sink. In the hallway to the home, he had an off-road motorcycle. In the garage that exploded, there was a second motorcycle that was completely destroyed. In bedroom three, where there were 9 to 10 trash bags of marijuana in addition to a vacuum oven that's used to burn off butane honey oil product, the defendant had his motorcycle boots tucked right underneath the vacuum oven next to 20-ounce butane canisters. In the kitchen, where there were a number, dozens of jars containing honey oil and containers containing powdered THC, the defendant had his dog's medication and had a bill for his dog's visit to the vet. Outside, right next to his... Outside on the patio, right next to where his dog's food bowls were, was another metal canister containing THC. In light of all this evidence, and in light of the fact that there was a note on the bedroom one door that said, uh, door will not latch, strapped when finished to prevent dog entry, indicating that the defendant knew exactly what was in the bedroom, put a note up there to warn anybody else who might be in the lab, who was working with him to maintain this lab, to latch the door specifically because it posed a danger of opening and letting his Rottweilers into the room. For all of these reasons, the government would submit that the evidence the government presented was more than sufficient to convict the defendant of maintaining the grant home for the purposes of manufacturing drugs. And unless the court has any further questions, the government submits on its briefs. It would appear not. Thank you, counsel. Thank you. Rebuttal. Thank you, Your Honor. To turn back to the suppression issue, Your Honor had a question about, uh, the participation of the Riverside Sheriff's Office in Hazmat's arrival and walkthrough of the scene. And I think the key evidence on this point, the government has said that, oh, it's improbable that they would use Hazmat here sort of as a stalking horse to get into the house and obtain information for a warrant. But at ER 177, that's the fire dispatch log. At 214, that's when the chief, who we learn is B-13B, the chief says, incident terminated on fire side. And B-13B available. That engine is now available. At 227, RSO, which is Riverside Sheriff's Office, requests Hazmat team recommit. So it was, indeed, the Riverside Sheriff's Office that asked Hazmat to come. We learn from Captain Valdivia's declaration that it's about at 234, I believe, a few minutes after that, that he is dispatched. He is not dispatched earlier. Um, there also, I would emphasize, is no evidence from his declaration at 163 to 164 that he saw that he was apprised of chemicals before entering. Again, a couple hours has already gone by here. Since the fire has been mostly put out, that was done by about 12, 15 a.m., the government says, certainly why would they do this? The government, those sheriffs could have gotten a warrant, but the fact here is that they did not get a warrant. Instead, piggybacking, I would argue, on the warrantless entry of this Hazmat officer, who was not needed until then, um, which I think belies the claim of exigency here. Um, and if there are no further questions, I would submit. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Rawlinson, Lee, Bress